## Case No. 13,984.

### THOMSON et al. v. The NANNY.

### FERGUSON et al. v. The JACK PARK.

[Bee, 217.] [1]

District Court, D. South Carolina. 1805.

ADMIRALTY — JURISDICTION — SEAMEN'S WAGES — FOREIGN VESSEL.

British seamen, belonging to two vessels in the harbour of Charleston apply to this court for a discharge, and wages, though the voyage is not ended. Court refused to interfere, (without deciding against its jurisdiction in all cases) principally because these men might have had redress before a tribunal of their own country in Surinam.

[Cited in The Jerusalem, Case No. 7,293: Davis v. Leslie, Id. 3,639; Ex parte Newman, 14 Wall. (81 U. S.) 169; The Topsy, 44 Fed. 635.]

[These were libels for wages by John Thomson and others against the ship Nanny, John Ainsworth, master, and Frederic Ferguson and others against the Jack Park, James Remsen, master.]

BEE, District Judge. The circumstances of these two cases are so nearly similar that all the arguments applicable to either apply to both. I shall, therefore, consider them together in this decree. The libel states that on the 17th September, 1804, the parties libellant were shipped in the port of Liverpool on board the above-named vessels, (being letters of marque) to proceed from thence to the coast of Africa; thence to a port or ports in the West Indies; thence to a port in the United States; and thence back to Liverpool, where the voyage was to end, at the respective wages mentioned in an exhibit filed with the libels. That they performed their duty as seamen on board, until their arrival in the port of Charleston on 22d June last, having stopped at St. Thomas and Surinam. The libel also states that on the voyage from Africa to the West Indies, the captains of these two armed vessels, confederating together and with their chief mates, pursued a system of plunder and piracy on the high seas, and on the 12th May last boarded a Portuguese ship and plundered her of sundry articles

[1] [Reported by Hon. Thomas Bee, District Judge.]

stated in the libel; and on the 14th May following, pursued the same conduct towards another Portuguese ship. The libels also charge, that during the voyage the seamen were unnecessarily put to short allowance, and one of them illegally confined. That, on their arrival in Charleston, the libellants, as well from a sense of moral duty, as from a fear of being tried as pirates and partakers of the guilt of the unlawful acts aforesaid, instituted prosecutions against the captains and mates in the circuit court of the United States, and have been bound under recognizance to appear and prosecute for the offences aforesaid; and, therefore, that it would be improper for them to proceed to sea in the said vessel, because they could not return in time to fulfil their recognizance, and because it would subject them to the danger of being taken as pirates: as the former conduct of the said captains and mates made it probable that they would proceed in their career of plunder, to which they did not desire to be instrumental: because also the libellants would probably be treated inhumanly, and prevented thereby from proceeding in said prosecution. For these reasons, they think themselves entitled to their discharge, from said vessels, and to payment of their wages now due.

To these libels, claims and answers have been put in by J. Ainsworth and J. Remsen, subjects of the king of Great Britain, and commanders, respectively, of the ships Nanny and Jack Park, duly commissioned, armed and equipped as letters of marque and private ships of war. These answers admit the several matters stated in the libels, as to the nature of the voyage and terms of enlistment. They also acknowledge the boarding, at sea, of two Portuguese vessels, and taking from them sundry articles of which they were in want, and which they thought they were entitled to take, on paying for the same, agreeably to the regulations of certain acts of the British parliament; and, so far from meaning to act illegally, they gave their names and the names of their vessels to the captains of said Portuguese vessels, with every particular relative thereto. A list of the articles taken by them is given in their answers; and they affirm that if any thing was taken, not mentioned in said list, it must have been taken by some of the boat's crew, without their consent or knowledge, or that of their mates. The answers also admit the putting to short allowance, from necessity; and the confining of some of the men, for mutinous conduct. The prosecution of the voyage, and arrival in Charleston, as stated in the libel, are also admitted. The claimants then conclude with a plea to the jurisdiction of this court, alleging that the said ships are British letters of marque, and the libellants subjects of his Britannic majesty; that their claims to wages are solely cognizable in British courts: and they also plead in bar the treaty of amity and commerce between the United States, and his Britannic majesty, dated at London, 19th

November, 1794, the 25th article of which they desire particularly to rely on.

In arguing the case, it was contended, in support of the plea to the jurisdiction, that the simple question was whether, the vessels being foreign, the seamen foreigners, and the voyage not ended, this plea should not be maintained. That the vessels were entitled, by treaty, to protection in the courts of the United States, as being private vessels of war. That every country has its own laws and regulations in military matters, with which this court can no more interfere than with its laws of revenue. That if this court should interfere to break up the voyage and cruize of these vessels, it would do so in violation of our neutrality, and in breach of our treaty with Great Britain. That, as an act of congress interdicted the parties from recruiting in our ports, these vessels could obtain no seamen here, and would be altogether destitute of their crews, if the libellants should succeed in obtaining their discharge; that freight being the mother of wages, none can be demanded until the voyage be ended, and the freight earned; that the articles are a solemn contract between the parties, which, not a law of congress, much less an act of this court, can dissolve; that the libellants, became bound to prosecute by their own voluntary act; that the information should have been given at Surinam, where a British court could have determined the matter without delay; that the seamen postponed their complaint merely to set up claims which, by desertion, they have forfeited.

On the part of the libellants it was contended, that there were two classes of seamen, parties to the suit; 1st, Those who claimed their discharge on account of cruel treatment. 2d, Those who claim a discharge by operation of law. It was argued that the voyage was ended by the act of the captain, and that this court has jurisdiction, and will extend protection to all who claim it. That by the laws of England, foreigners arriving there must be protected in all their courts, which will take notice of the lex loci where the foreigner belongs, and give redress accordingly. Contracts bearing interest of 20 per cent. had been enforced in England, because such was the legal interest of the place where the contract was made. That the voyage being ended, and the men discharged by operation of law, they are entitled to wages. That from the peculiar situation of seamen their remedy is chiefly in rem; and two cases were quoted (Canizares v. The Santissima Trinidad [Case No. 2,383], and Moran v. Baudin [Id. 9,785]) to shew that courts of admiralty (contrary to the doctrine of Sir William Scott) would and did exercise this jurisdiction. The argument was closed by observing that the recognizance to appear and prosecute was virtually a discharge, whether wages were due, or not; though the one was a necessary consequence of the other.

In reply, two cases from Robinson's Re-

ports (1 C. Rob. Adm. 271, and 4 C. Rob. Adm. 240, Eng. Ed.) were relied on to shew that a neutral court cannot exercise jurisdiction over foreign seamen and vessels, where the voyage is not ended; or, admitting that they have a concurrent jurisdiction, they are not bound to exercise it. Three facts, it was said, were evident from the pleadings: 1st, That the vessels were British; 2d, that the seamen were also British; 3d, that the vessels were armed, and by their articles obliged to return to Great Britain. That the libellants, therefore, have no claim upon the jurisdiction of the courts of this country, which may be exercised or not, as those courts shall see fit. That seamen's wages were not originally of admiralty jurisdiction, however salutary might have been the stretch of power that made them so. That the recognizance neither does, nor ought to, operate as a discharge; since, if it did, a mere affidavit of an assault would be sufficient to destroy a voyage, by releasing the seamen from their articles, to the infinite injury, if not total annihilation of commerce. In answer to the cases from Robinson, it was contended that seamen's wages were as much determinable by the law of nations, as salvage. On a former occasion, about seven years ago, I determined a question on a plea to the jurisdiction of this court, in a case somewhat similar to this; since which I have declined interfering between foreigners, respecting seamen's wages, from a conviction that, unless under very particular circumstances, it was proper to refer them to the tribunals of their own country, where the lex loci being better understood, more complete justice could be done than in a foreign court, at a distance, and not thoroughly acquainted with the rules obtaining in the country of the parties. I stated my doubts on this point at the commencement of this cause, declaring at the same time my wish to have the matter reargued. I have attended to the arguments and observations, on both sides, with satisfaction, and I proceed to deliver my decree after much reflection, and a full consideration of all that has been said.

Mariner's wages were not always recoverable in the courts of civil law, even amongst maritime nations; and in England, it was after long contests between the judges of these courts and those of the courts of common law, that the latter yielded the point. Two reasons operated to produce the concession: 1st, That seamen could, in the civil law courts, join in one suit; 2d, that, in these courts they could obtain summary justice, which, in those of common law, was denied by the nature of the proceedings there. Nevertheless, a concurrent jurisdiction is exercised by the latter. Two cases from Robinson's Admiralty Reports were produced, and much relied on by defendants' counsel, relative to the jurisdiction of British courts of admiralty, respecting foreigners. Two cases [Cases Nos. 2,383 and

9,785] were relied upon by the counsel opposed to them, as being directly hostile to the general doctrine. I have carefully examined these four cases, but do not see the variance contended for. In the case from 1 C. Rob. Adm. 251, Sir William Scott overruled the plea to the jurisdiction of the court, partly because it was not a case in which foreigners alone were concerned, and partly because it was a question of salvage, which, he says, is peculiarly referable to the jus gentium, and materially different from a mariner's contract which is created by the particular institutions of each country, and must be applied, construed and explained by its own particular rules. He goes on to say, "There might be good reason, therefore, for this court to refuse its interference in such cases, remitting them to their own domestic forum." He adds: "Between parties, all foreigners, if there were the slightest disinclination to submit to the jurisdiction, I should be inclined not to interfere." He desires, however, not to be understood as delivering a settled opinion, although it involved a case of salvage. In the other case from 4 C. Rob. Adm. 240, which respected the possession of a vessel, (but involved property too) the judge says that it was accompanied by a letter from the American minister, stating that the parties were all Americans, and willing to submit to the jurisdiction of the court. He was, therefore, induced to entertain the suit, which, without such application from a foreign minister, and such consent of parties, he should by no means have been willing to do, having no disposition to interfere in the disputes of foreigners. In the first case quoted (Canizares v. The Santissima Trinidad [supra]), two separate causes of suit are contained; one respecting an hypothecation, made that the vessel might be enabled to proceed from Havanna to Philadelphia; the other for wages on board said vessel from Havanna to Philadelphia, as a pilot. The voyage therefore was ended, on her arrival at Philadelphia, as to both these causes of action, and the court could not decline the jurisdiction. This case, therefore, does not differ from the principles laid down by Sir William Scott. The other case (Moran v. Baudin [supra]) was that of a vessel and crew wholly French. The suit was brought on an engagement for a voyage certain, from which there had been a total deviation for upwards of two years. France and America were then allied, and no consular convention existed. The prayer was for wages and a discharge, and no plea was made to the jurisdiction. Under these circumstances the court took cognizance of the cause. But from this solitary case nothing can be inferred to impugn the doctrine laid down by Sir William Scott, strengthened as it is by the two cases from 3 Ves. 447, and 4 Ves. 577, for though this question did not expressly come before the court of chancery,

yet the determination in both the last mentioned cases, shews the reluctance of that court to interfere between foreigners. In 2 Brown, Civ. & Adm. Law, 119, the author says: "It doth not seem possible to draw an exact line about the jurisdiction which this court will exercise as to foreigners. It must depend on the nature of the question; if it arises from the particular institutions of any country, to be applied, construed, and explained by the particular rules of that country, it will not be entertained. Such are questions arising upon the contracts of mariners, which will be remitted to their own forum; because the contract for wages cannot be the subject of a suit, till the return of the vessel, or end of the voyage. But (he adds) where the question is one arising out of the jus gentium, to be determined by sound discretion, acting upon general principles, the court will hold plea of it. Cases of salvage, &c. and suits on bottomry have often been entertained in this court between an Englishman and foreigner, and between two foreigners."

Upon mature consideration of these cases, and of the reasoning thereon, I am of the opinion which I stated at the opening of the cause: "that this court should be very cautious in exercising jurisdiction as to foreigners, unless under peculiar circumstances." At the same time, I would not be understood as relinquishing jurisdiction where it may appear proper or necessary to prevent a failure of justice. In the case before me, it is admitted on all hands, that the voyage is not ended, and that, by the contract, no wages are due till then. But it is contended that the seamen are discharged by operation of law. If so, this court cannot prevent it; but it will not, by any act of its own, impair the obligation of the contract. If an act of piracy has been committed, and if the recognizance to prosecute is a legal discharge, another consideration arises, namely, that in piracy all are principals; and where (says Molloy) a letter of marque commits piracy, it brings on a forfeiture of the ship, and the wages are also lost.

Upon the whole, although I do not say that this court has no jurisdiction in matters respecting foreign seamen, yet I think it ought not to exercise any in the case now before it, but remit the parties to their own domestic forum. The libellants cannot complain at being thus turned over to their own courts; for they might have applied for redress at Surinam, where such courts exist. Having neglected to do so, they must blame themselves.

I order and decree that the libel be dismissed, but without costs; for suits heretofore maintained, in cases apparently similar to this, might well mislead the parties in the present case.